IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DONNA BLAKE** <br> **350 Lessin Drive** <br> **Lusby MD 20657** <br>             **Plaintiff,** <br><br>      v. <br><br> **THE ARCHITECT OF THE CAPITOL** <br> **c/o General Counsel** <br> **Ford House Office Building H2-265A** <br> **Second and D Streets SW** <br> **Washington, DC 20515** <br>             **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Action <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**COMPLAINT**

Plaintiff, Donna Blake, a Painter at the Architect of the Capitol, has been discriminated against and harassed in violation of the Congressional Accountability Act because of her sex and in retaliation because she complained about sex discrimination.

Plaintiff is a Grade (WG) 9 Painter with Defendant's Library Building and Grounds Jurisdiction. Since 2014 she has faced persistent harassment from her Supervisor, Walter Skinner, who has harassed Ms. Blake because of her sex by making lude comments and humiliating her because she is the only female painter in the shop. Among other things, Mr. Skinner repeatedly told Ms. Blake that she is not a "real painter" and that she should get a desk job in the Superintendent's office because she is a woman, has told her that if she wants a promotion she should wear a short skirt and "go bend over" in the Superintendent's office. Skinner also attempted to force Plaintiff into falsifying a disability so that she could be transferred to a "desk job" and imposed special conditions on her receiving promotions not in line with what was required of the

male painters.  Other AOC supervisory employees also harassed Ms. Blake due to her sex and protected activity, including but not limited to Doug Helmann, Erma Teacher, and Mike Reid.

On January 22, 2019 the Plaintiff's claims against the AOC, including but not limited to her claims related to Mr. Skinner, were resolved to the satisfaction of all the parties. Thereafter, the hostile work environment against Plaintiff continued, including hostile treatment on the part of Mr. Skinner and other AOC employees and supervisors toward Plaintiff.

## JURISDICTION

1. Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2. This is an action authorized and instituted pursuant to the Congressional Accountability Act, as amended by the Reform Act of 2019 (2 U.S.C. § 1301 *et seq.*).

3. The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4. Plaintiff is a current employee of the Architect of the Capitol.

5. Defendant Architect of the Capitol (hereinafter "Architect" or "AOC") is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

6. AOC is headquartered in the District of Columbia.

7. The Congressional Accountability Act, at 2 U.S.C. § 1317, makes it unlawful for the Architect to retaliate against employees who have either opposed discrimination that violates the Congressional Accountability Act or who have filed claims of discrimination with the Office of Compliance (now known as the Office of

Congressional Workplace Rights).

8. The Congressional Accountability Act, 2 U.S.C. § 1311, mandates that "all personnel actions affecting covered employees shall be made free from any discrimination based on … sex".

9. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely Complaint with the Office of Congressional Workplace Rights (OCWR) on November 12, 2019, prior to filing this Civil Action. Plaintiff's OCWR Complaint raised the discriminatory and retaliatory hostile work environment claims raised herein.  This suit is filed within the 70 day deadline measured from the date that Plaintiff filed her Complaint with the OCWR as required by 2 U.S.C. § 1401(b)(3).

## FACTS

10. Plaintiff is currently employed as a Wage Grade (WG) 9 Painter at the Architect of the Capitol, in the Library Building and Grounds Jurisdiction.

11. Plaintiff began her employment in the Library Buildings and Grounds Jurisdiction in August 2013, as a WG-2 Helper.

12. Plaintiff regularly works the day shift.  In addition to her regular painter duties, since August 16, 2016, Plaintiff has also been the appointed "property custodian" for the Paint Shop.  Additionally, until approximately the beginning of November 2018, Plaintiff was in charge of ordering all materials and supplies for the Paint Shop.

13. At all times relevant to this complaint, Plaintiff's supervisor was Walter Skinner, the Day Shift Supervisor of the Paint Shop.

14. At all times relevant to this complaint, Walter Skinner reported to Michael Reid, the

    Foreman of the Paint Shop.  Mr. Reid reports to Assistant Superintendent, Douglas Helmann.

15. Mr. Skinner, who for years had a poster with bikini-clad women posted on his locker, has repeatedly belittled and embarrassed Ms. Blake since he began working in the Library Jurisdiction in 2014.

16. Mr. Skinner routinely called Plaintiff demeaning and condescending names targeted at her sex. On numerous occasions, Skinner has called Ms. Blake the "Sears Roebuck Model;" "Vanna White;" "Chrissy Snow" (the airhead blond character in Three's Company); and "the face of the AOC."

17. On several occasions, Mr. Skinner told Plaintiff that she was a distraction to the men in various shops because all the men stared at her.

18. Mr. Skinner regularly tells Plaintiff that she is "not a real painter" and in a poorly-veiled threat against her job, he told her that "women cry when they lose their jobs."

19. Mr. Skinner has also demeaned Ms. Blake because – as a petite woman – she requires ladders and extension poles to paint upper parts of doors and walls.  Consequently, Skinner regularly mocks Ms. Blake when she paints due to her stature.

20. In the Spring of 2014, when Ms. Blake asked for promotion from her WG-2 position to a WG-5 position, Skinner refused to promote her, and he required Ms. Blake to get the approval from a higher-level supervisor (Chris Miles).

21. Rather than allow Ms. Blake to be promoted based on the merit and quality of her work, Mr. Miles put Ms. Blake's promotion to a vote of her all-male colleagues in the paint shop.  Ms. Blake was promoted because the Painters in the shop, who generally appreciate Ms. Blake's hard work and devotion to the job, voted in her favor.

22. When Ms. Blake asked Mr. Skinner for a promotion from to a WG-7 position, in late 2014, Skinner again refused. Consequently, Ms. Blake appealed to the Paint Shop Foreman, Michael Reid for the promotion.

23. Mr. Reid told Ms. Blake that he would agree to promote her if she would volunteer to work on the AOC's Combined Fundraising Campaign (CFC) that year and into the future. Ms. Blake agreed to participate, and she was promoted.

24. In her role with the CFC, Ms. Blake was encouraged to wear revealing costumes, including a Santa Claus outfit with a knee length dress and a Robin Hood outfit, which was essentially a long blouse with only tights underneath. She was then asked to go solicit donations door to door in the various shops from the mostly male supervisors and employees.

25. When Ms. Blake told Mr. Skinner that she was dyslexic, on October 22, 2015, Skinner exclaimed "they hired you like that!" This caused Plaintiff to burst into tears.

26. On October 23, 2015, Plaintiff came into the Paint Shop 30 minutes after clocking in. Mr. Skinner told Plaintiff that she was "taking advantage of [his] kindness" and then told her that they could "take care of this like adults" or he could write her up. Plaintiff took this as a suggestion that Skinner would forget about the tardiness if Ms. Blake engaged in a physical sexual relationship with him. Mr. Skinner followed that comment by saying "I don't want the other supervisors talking about you. They are already saying that everyone has a crush on you. You are a distraction in the meetings." Mr. Skinner then made reference to the plumbers having a crush on Ms. Blake.

27. Later that morning, on October 23, 2015, Mr. Skinner humiliated Ms. Blake by –

having just learned that she was dyslexic (¶ 25) – asking her to read the safety tip for the day to all of the Painters at the morning meeting. Skinner had never asked any of the Painters to read anything during the morning meeting.

28. Ms. Blake again burst into tears and she and George Wine (another Painter) went to the Superintendent's office, where they recounted the story to the Foreman, Michael Reid.

29. During that October 23, 2015 meeting, Mr. Wine told Mr. Reid that he believed that Skinner had a problem with the Plaintiff because she was a woman, and that Mr. Skinner did not think that women should be painters. Without conducting any investigation whatsoever, Mr. Reid responded that he did not believe that Mr. Skinner was "like that." Wine had reported Mr. Skinner's hostile conduct toward Ms. Blake to Mr. Reid on an earlier occasion, again with no impact.

30. In late 2015, Mr. Skinner told Ms. Blake that in order to be eligible for a promotion to WG-9, she required a lead abatement worker license, something which none of the male painters were required to attain.

31. As a result of the conditions that Mr. Skinner imposed, Ms. Blake undertook the required training and received her lead abatement supervisor license in January 2016 and for her project design license, in April 2016.

32. Even after she attained the required licenses, Skinner refused to promote her. Skinner told Plaintiff, by way of explanation, that when he worked in the union, he had been the only black man in the union and so he had to work twice as hard as everyone else. Skinner then explained that the same was true of Plaintiff: as the only woman in the shop, she had to work twice as hard as the men in order to be promoted.

33. Because Mr. Skinner refused to promote her, sometime in or around January 2016, Ms. Blake spoke to Assistant Superintendent Doug Helmann about her request for a promotion.

34. During this January 2016 conversation with Mr. Helmann, Ms. Blake told Helmann about the unfair conditions that Skinner had imposed on her for promotion, and she told Helmann that she believed that Skinner was discriminating against her because she is a woman. Helmann did nothing to investigate Ms. Blake's claims.

35. In the summer of 2016, Skinner asked Ms. Blake why she did not have a boyfriend. When Ms. Blake responded that it was not the right time for her, Skinner responded by loudly asking: "What, do you like women?" This was during the lunch break, in the presence of several of Ms. Blake's male coworkers.

36. On or about December 11, 2016, Plaintiff was promoted to a WG-9 Painter, on information and belief, in a decision in which Mr. Skinner did not participate.

37. Plaintiff gave birth to a child in July 2017 and was on maternity leave for several months.

38. During the week of May 7, 2018, Mr. Skinner told the men in the shop that he was going to remove Ms. Blake as a Painter and get her moved to an administrative job in Superintendent Brown's office, so he could get a "real painter" (meaning a man) to replace her.

39. On May 10, 2018, Mr. Skinner told Blake about a meeting to be held later that day with Doug Helmann, Superintendent Brown's immediate subordinate.

40. Mr. Skinner told Ms. Blake that during the meeting with Helmann she needed to pretend to have an injury that prevented her from painting in order to get a transfer

     (by way of an accommodation) to an administrative job in Superintendent Brown's office. According to Skinner, all Plaintiff needed to do was tell Helmann she couldn't do the work of a painter because of her shoulder injury.

41. Later in the day on May 10, 2018, Ms. Blake met with Mr. Helmann and Mr. Skinner. During that meeting, Skinner claimed that Plaintiff was unable to paint, but Plaintiff contradicted Skinner. Ms. Blake told Mr. Helmann that she did not want an accommodation and showed him that she had full range of motion in her shoulder.

42. Despite Ms. Blake's statement that she was able to paint without restriction, Mr. Helmann instructed Ms. Blake to make an appointment with Corniece Brown, the Reasonable Accommodation Coordinator in the AOC Diversity Inclusion and Dispute Resolution Office, to attempt to secure a reasonable accommodation.

43. Based on Mr. Helmann's instruction to Ms. Blake, Mr. Helmann participated in the discriminatory plan to have Ms. Blake falsify a disability in order to be moved to Superintendent Brown's office in an administrative capacity.

44. During the week of May 14, 2018, Mr. Skinner assigned Ms. Blake to work in the Superintendent's office, finishing drywall by herself, which is grueling work. Skinner told Blake that she could "either be sitting in a desk in that office or finishing the drywall."

45. On May 17, 2018, Ms. Blake met with Corniece Brown for the appointment that Helmann and Skinner had arranged as part of Skinner's plan to dupe Plaintiff into asking for a transfer.

46. Ms. Blake told Corniece Brown about Skinner's harassment of her over the years, and she told Ms. Brown that Skinner was prompting her to falsely claim that she had a

        shoulder injury and to request an accommodation. Ms. Brown responded that she believed Ms. Blake was experiencing a hostile work environment and that she would write up a memo for Superintendent Larry Brown's attention so that he could take action to protect Plaintiff.

47. Neither the Superintendent nor any of his subordinates came to Plaintiff's assistance or took any action against Skinner or Mr. Helmann for their discriminatory conduct.

48. Later in the day on May 17, 2018, Mr. Skinner again assigned Ms. Blake to work by herself, finishing drywall from an 8-foot ladder with no assistance and no one to hold the ladder. Ms. Blake objected due to safety concerns. Mr. Skinner then showed Ms. Blake how to work on the ladder backwards and then repeated his instruction that she perform the job alone. Skinner mentioned that the ladder that Ms. Blake was using was dangerously wobbly and told her to get rid of it and replace it with a new ladder <u>after she had finished the project in question</u>.

49. On May 15, 2018, Mr. Skinner advised Ms. Blake that she required an accommodation because – according to him – she was not painting in a "standard" way. Ms. Blake emailed Skinner to ask for any documentation that defined the "standard" way, and Skinner responded to her (orally) by asking if she wanted to play word games with him.

50. During the week of May 21, 2018, Mr. Skinner told Ms. Blake that she should go on vacation with her fiancé, without their baby, and then he made lude "humping" gestures and sounds mimicking sexual thrusting.

51. On May 31, 2018, Mr. Skinner instructed Plaintiff to sand a section of wall that has silica-containing joint compound. When Plaintiff informed Skinner that silica is now

9

considered a hazardous material that can poses health risks to asbestos and that she has not been trained on how to safely work with silica-containing compounds, Skinner responded that if she wanted to be a painter, she had to work with the material.

52. On June 1, 2018 Plaintiff engaged in protected activity under the Congressional Accountability Act when she filed a timely Request for Counseling at the Office of Compliance (now known as the Office of Congressional Workplace Rights) to raise Plaintiff's hostile work environment, discrimination and retaliation claims.

53. Plaintiff engaged in the counseling process and filed a timely Request for Mediation on June 28, 2018 at the conclusion of the Counseling Period.

54. Plaintiff's OCWR claim raised her sexual harassment claim against Mr. Skinner as well as hostile conduct on the part of other AOC employees, including but not limited to hostile conduct that began in July 2017 and continued through February 2018. Details of the harassment claims were properly presented in Plaintiff's complaint at the Office of Compliance/Office of Congressional Workplace Rights as well as during the confidential mediation period, which gave the AOC notice of those claims and an opportunity to rectify them.

55. In June 2018 Plaintiff was interviewed by the Inspector General. In order to protect her from, *inter alia*, retaliation, the Inspector General gave Plaintiff assurances that her identity would be kept confidential and only provided orally to management officials who had a "need to know" in order to take appropriate disciplinary action.

56. In early October 2018, Skinner told at least one of the male Painters in the shop that he could not mess with Plaintiff "while she was lactating."

57. The Architect of the Capitol finally initiated an investigation into Mr. Skinner's harassment of Plaintiff in November 2018 – years after Plaintiff and her colleagues first complained about Mr. Skinner and six months after Corniece Brown's meeting with Plaintiff in which she said that she would report to management about the hostile work environment that Mr. Skinner was imposing on Ms. Blake.

58. Rather than remove Mr. Skinner from his position (under either paid administrative leave or otherwise), the AOC transferred Ms. Blake so that she would receive all work instructions and supervision from Mike Reid. The AOC thus punished the victim and isolated her from the other Painters in the shop, all of whom continued to receive instruction about assignments from Mr. Skinner.

59. Plaintiff is unaware of any specific action the Architect has taken to discipline anyone for their harassing and retaliatory conduct toward Ms. Blake.

60. At various times since 2014, Plaintiff's coworkers (specifically Larry Denison and George Wine) have complained to Doug Helmann and Michael Reid about Mr. Skinner's discriminatory treatment of Plaintiff, but neither Helmann nor Reid took any action to assist Plaintiff or to end the hostile conduct.

61. On January 22, 2019 the Plaintiff's claims against the AOC, as included in her June 1, 2018 request for counseling, were resolved to the satisfaction of all the parties.

62. Despite that January 2019 resolution, the hostile work environment continued even after January 22, 2019.

63. On March 7, 2019, Ms. Blake told Mike Reid that the paint shop inventory was off and that she needed assistance in reconciling the discrepancy. Mr. Reid did not extend any help to Ms. Blake. Instead, Reid told Ms. Blake that she would be held

accountable for any discrepancy and he arranged for a "spot check" of inventory for the paint shop to be performed on March 19, 2019. This conduct was intimidating as it put Plaintiff in fear of disciplinary action or reduced performance appraisals and awards. The threat was intended to intimidate Plaintiff from engaging in protected activity in the future.

64. Ms. Blake asked Mr. Reid for a copy of the inventory spot check, so that she could use the report to assist her in finding the discrepancy and reconciling the inventory. Mr. Reid never provided that report. On March 22, 2019, Ms. Blake spoke to the individual who had performed the spot check to ask for a copy of the report. The individual told Ms. Blake that Mr. Reid told him not to provide her with a copy of the report. In this way, Mr. Reid denied Ms. Blake any assistance in performing her inventory duties, and made it more difficult or impossible for her to identify the source of the discrepancy – leaving her in fear and at risk for discipline, reduced performance evaluations and denied awards in the future, or of having the higher graded inventory duties removed from her.

65. On March 14, 2019, Ms. Blake's daughter – who had applied for an internship at the AOC – was at work with Ms. Blake. Ms. Blake brought her daughter to speak to Mr. Reid. Reid insinuated that Ms. Blake's daughter would not pass the suitability appointment because of drug use. When Ms. Blake protested that her daughter was a good kid, Mr. Reid tormented Ms. Blake – responding: "look at her face. She looks nervous. Kids come up here all the time thinking they can get the job only to fail the drug test."

66. On March 25, 2019, Mr. Reid and Doug Helmann instructed Plaintiff that she was

being returned to work directly under Walter Skinner's supervision, effective on March 27, 2019. .

67. As a result, Plaintiff was transferred to a supervisor who – on information and belief – had never been disciplined for his harassment of her and who had not received any significant training on discrimination in the workplace.  Consequently, Plaintiff was placed in fear of continuing to be subjected to harassment by Mr. Skinner, which is indeed what occurred.

68. After he was again her direct supervisor, Mr. Skinner assigned Plaintiff to paint closets by herself for several weeks.  Painting closets is generally seen as demeaning work, since the work is not generally visible, and painters typically work in teams, so the assignment to work by herself was a retaliatory instance of Mr. Skinner attempting to belittle and make Plaintiff feel isolated from the rest of the painters.

69. Shortly after Skinner was restored as Plaintiff's supervisor, he ceased assigning Plaintiff the higher-graded inventory control duties for which she was previously designated the Paint Shop custodian. From that point forward the inventory duties have only been given to Plaintiff sporadically.

70. On April 4, 2019, the Painters attended a Daily Briefing on "Types of Problem Employee Behavior." The briefing listed "gossiping, displaying general incivility/insolence, bullying and exhibiting insubordination" as the specific types of problem employee behavior.  During the briefing, Mr. Skinner started at Plaintiff rubbing his hands and with an exaggerated smile in a show that he either intended to act like a "problem employee" toward Plaintiff or that he intended to discipline Plaintiff as a "problem employee."

71. On April 18, 2019, in discussion about a project that involved going up on a mechanical lift to reach high windows, Plaintiff stated that she sometimes experienced fear of heights. Mr. Skinner responded, consistent with his past remarks to and about Plaintiff, "Well then, you should not be a painter."

72. On May 8, 2019 another AOC employee, who works in the Capitol Power Plant sent Plaintiff a text message stating that he heard that she had been paid $370,000 in a settlement. On information and belief, the employee heard the rumor about a settlement from an AOC supervisor.

73. The Congressional Accountability Act, as written at the time, required that any and all settlement agreements be kept confidential, and Plaintiff has studiously abided by all of her obligations under the law. Therefore, any rumors about a settlement must have originated with AOC supervisors who were involved in the January 2019 resolution.

74. On information and belief an Inspector General investigation uncovered offensive email communications by and between the Superintendent of the House Office Buildings, William Weidemeyer, as well as the Superintendent of the Senate Office Buildings, Takis Tzamaras. As a result of those offensive emails, both of those Superintendents were placed on administrative leave in April 2019, and they both ultimately separated from employment at the AOC in July 2019.

75. Even though Ms. Blake's name and involvement in the Inspector General investigation was to be kept confidential, and although the Inspector General was to restrict all witnesses and recipients of the report that Plaintiff's identity was to be kept confidential, that confidentiality and Plaintiff's privacy was not respected.

76. In an additional act of retaliation, on information and belief, one of the high-level managers whom the Inspector General briefed on Plaintiff's identity spread a rumor that Plaintiff initiated the Inspector General's investigation that led to the ouster of two AOC Superintendents, William Weidemeyer and Takis Tzamaras.

77. On June 9, 2019, the Power Plant employee mentioned in Paragraph 72, who heard a rumor about a settlement involving Plaintiff, sent Plaintiff a communication stating, *inter alia*: "I think I should get some of your lawsuit money." On information and belief, the supervisor who shared information with the Power Plant employee knew and intended for the Power Plant employee to further harass Plaintiff because of her protected activity.

78. Throughout the spring and summer of 2019, and becoming more intense after Weidemeyer and Tzamaras stepped down in July 2019, AOC employees from a number of jurisdictions, including the LOC Paint Shop, the Capitol Power Plant, the LOC Masonry Shop, the House Elevator Shop and the House Carpentry Shop told Plaintiff that supervisors in their respective shops had told them that Ms. Blake was responsible for Mr. Weidemeyer, Mr. Tzamaras and Mr. Brown being removed from the AOC.

79. The release and propagation of the rumor about Plaintiff was an act of retaliation by AOC management for Plaintiff's earlier claim of discrimination at the Office of Compliance/OCWR and constitutes part of Plaintiff's ongoing hostile work environment.

80. On August 16, 2019, Mr. Skinner found Plaintiff in the break room and put a copy of an announcement for a detail opportunity for a "Administrative Support Assistant"

position in front of her. Mr. Skinner stated: "This is your way out." By so doing, Mr. Skinner was returning to a theme from the continuing harassment which was that Plaintiff should not be a painter because she is a woman and that she should have a desk job instead.

81. On September 26, 2019, Mr. Skinner was arguing with paint shop employees in Plaintiff's presence, and Skinner made the statement: "You all have all the protections. Just ask 'Ms. Policy Pusher' over here," and he directed his attention to Plaintiff. This was a reference to Plaintiff's complaint at the Office of Compliance addressing Mr. Skinner's violation of the anti-harassment and discrimination policy and laws at the AOC.

82. On September 26, 2019, Erma Teacher – who was a central figure in Plaintiff's earlier harassment claim – cornered Plaintiff after Plaintiff had clocked out. Ms. Teacher told Plaintiff that she heard Plaintiff had been paid $200,000. Ms. Teacher also made offensive and hurtful comments to Plaintiff similar to the hostile conduct that she directed at Plaintiff, as referenced in Paragraph 54.

83. On October 10, 2019, Mr. Skinner told Plaintiff and another employee (who has made complaints about Skinner's discriminatory conduct toward Plaintiff in the past) that he tried to give both of them unsuccessful performance evaluations only to be blocked by the AOC. He also told Plaintiff and the other employee that he had attempted to have an audit of their positions conducted because "some of you can't do your job description," a comment that was directed at Plaintiff and a continuation of Mr. Skinner's past harassing comments based on Plaintiff's sex.

84. On October 21, 2019, Mr. Skinner put Plaintiff in fear of disciplinary action when he

told her that he was documenting each time she returned to the paint shop prior to 30 minutes before the end of her shift. In an exaggerated manner, Skinner taunted Ms. Blake by repeating: "document, document, document!" while pantomiming himself filling out paperwork to discipline Ms. Blake.

85. On November 6, 2019, picking up on a theme he had used to torment Ms. Blake in the past, Mr. Skinner rated Ms. Blake as only "Fully Successful" in the Critical Performance Element of "Work Relationships." In his narrative explanation of "areas of improvement," Mr. Skinner listed "Participate more in Team Builders [*sic*] training and other classroom training sessions." That explanation relates to the fact that Ms. Blake declined to perform an oral reading of a lesson during a team training session, due to her dyslexia, which Mr. Skinner had long known about (¶¶ 25, 27, *supra*). During the training, at which Mr. Skinner was present, the trainer repeatedly asked Ms. Blake to read a passage to the rest of the paint shop, and Ms. Blake repeatedly responded that she was not comfortable doing so. Although he knew that Ms. Blake was reluctant to perform reading out loud as a result of her dyslexia, Mr. Skinner took advantage of the episode to humiliate and embarrass her in her mid-term performance rating. This feedback constitutes a further instance of hostile treatment aimed at Ms. Blake because of her sex and retaliation, with the intent of driving Ms. Blake out of the Paint Shop.

86. To this day Ms. Blake continues to live under the hostile work environment based on her sex and protected activity and created by Mr. Skinner and other AOC employees.

## COUNT I: HOSTILE WORK ENVIRONMENT BASED ON GENDER AND RETALIATION

87. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were

specifically restated here.

88. The hostile conduct described herein at the hands of Plaintiff's supervisors and AOC management was "materially adverse" in that it was sufficient to dissuade a reasonable employee from engaging in protected activity.

89. The hostile work environment alleged herein was additionally severe and/or pervasive enough to alter the terms and conditions of Plaintiff's employment, and it was targeted at Plaintiff because of her sex (female) and her protected activity (including complaining about the hostile environment).

90. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing her job.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying her any monetary and/or liquidated damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff